(Irwin *v.* Keen.)

---

[PHILADELPHIA, FEBRUARY 17, 1838.]

## IRWIN *against* KEEN.

### APPEAL.

1. Where an assignment for the benefit of creditors provided for the payment, in the first instance, of an alleged debt, to the son of one of the assignees, who, in point of fact, was not a creditor, the preference being fraudulently intended for the benefit of the assignor himself, it was *held*, that the whole assignment was invalidated by this circumstance, and that the assignee was not entitled to receive the proceeds of real estate of the assignor, for the benefit of the remaining creditors in the assignment, as against judgment creditors of the assignor.
2. Where the proceeds of property sold under an execution, are brought into Court for distribution, and claimed by an assignee under a voluntary assignment for the benefit of creditors, and by judgment creditors of the assignor, it is not necessary to make the creditors named in the assignment parties to the proceedings.
3. Where an assignment for the benefit of creditors contained a provision for the payment in the first instance, of an alleged debt to the son of one of the assignors, it was *held*, that evidence of declarations of assignors, made after the assignment, tending to show that the person preferred was not in fact a creditor, and that the arrangement was intended for the benefit of the assignor and his family, was admissible, in proceedings between the assignee and judgment creditors of the assignor.

THIS was an appeal from a decree of the District Court for the City and County of Philadelphia, dirtributing the proceeds of a

(Irwin v. Keen.)

*sheriff's sale of certain real estate, sold upon an exe-   [*348]
cution in a suit of John Irwin against James C. Keen
and Hetty Keen his wife, late Hetty Thomas.

The fund in the Court below, which amounted to $1491 96,
arose from the sale by the sheriff of certain real estate conveyed
by James C. Keen and Hetty his wife, on the 6th of July, 1827,
to William Seddon, in fee, subject to a mortgage of $1400, under
which the sale was effected; and also subject to a ground rent of
$25 60 per annum.

The case was referred to an auditor, on whose report the fol-
lowing facts appeared.

On the 12th of March, 1835, William Seddon conveyed the
premises (subject to the ground rent) to Stephen Poulterer in
fee, for the consideration (as by the face of the deed) of $3500;
which deed was recorded on the 31st of March, 1835.

A declaration of trust of even date with the said deed was
executed by the said Stephen Poulterer and William Seddon,
declaring that Poulterer held the premises in trust for the said
William Seddon for life with remainder in fee to Mary Seddon,
his daughter; with power to the said William Seddon at any
time by deed or last will to revoke or alter the said trusts, or to
create new or additional trusts.    On the same day a memoran-
dum under seal was executed by the said Stephen Poulterer,
stating that the said consideration money of $3500 was not actu-
ally paid by him, but was inserted on the conveyance for mere
form.

On the 15th of January, 1836, the said William Seddon and
his copartner, Benjamin Bown, trading under the firm of Bown
& Seddon, being in insolvent circumstances, executed an assign-
ment of the property to William Baker, in trust, to convert the
effects and premises assigned into money, and to distribute the
same amongst the creditors of the said Benjamin Bown and
William Seddon, in the manner therein prescribed, viz., first, to
pay nine preferred creditors therein mentioned the amounts due
to them in the order in which they are named : then to pay such
other creditors as should within sixty days from the date there-
of, execute a release to the assignees.

On the 1st of February, 1836, William Baker, the assignee,
by certain articles stipulating a release of all demands against
the firm of Bown & Seddon, conveyed to Abraham Bown, (the
first preferred creditor, and son of the co-partner, Benjamin
Bown,) the goods and chattels of the partnership, valued at
$980 42.

William Seddon died in the month of June, 1836; and upon
the 5th of August, 1836, Stephen Poulterer placed upon record
the declaration of trust and memorandum relating to the consid-
eration money of the deed to him.

(Irwin *v.* Keen.)

[*349]     *Under these circumstances, the fund for distribution was claimed by several persons: 1st. By Stephen Poulterer, as trustee of Mary Seddon, under the deed of March 12th, 1835. 2nd. By Wm. Baker, as assignee of Bown & Seddon, under the deed of assignment of January 15th, 1836: and 3dly. By various judgment creditors of the firm under judgments subsequent in date to the assignment of January 15th, 1836.

1st. The auditor rejected the claim of Stephen Poulterer, regarding it as a voluntary conveyance made to protect the premises from liability for debts by the grantor.

2nd. In respect to the claim of Baker, the assignee, the auditor reported, that the first preferred creditor was Abraham Bown, a journeyman, just of age, in the employment of Bown & Seddon, and son of the said Benjamin Bown. The amount for which he was preferred was $2558. The aggregate amount due to the eight remaining creditors preferred was $907.

The debt of Abraham Bown was contested on the part of the creditors; and the amount of the preference being greater than the value of the partnership effects, it was alleged to be a fraudulent attempt, on the part of the firm, to sweep into their own hands the whole partnership effects, under cover of the alleged indebtedness to the son of one of the partners. In support of the preference to Abraham Bown, the testimony of Benjamin and Frances Bown was taken by the auditor, and was in substance as follows.

Benjamin Bown testified, that his father, a day or two before his death, called him to the bedside; told him he would find some money in a green bag in the blue chest: that he wanted witness to write down what he should say to him. There being no paper in the room, he told him to take the geography, and write down his declarations. He told the witness he would find $1500 in $100 rolls of notes, $62 in silver, and twenty doubloons. He directed the witness to keep the money in the bag in trust for his grandson, the witness's son Abraham, until he arrived at twenty-one years of age; desired him to make no use of it in any way. Witness promised he would not use it: witness wrote down his instructions on a blank leaf at the end of the book, and the amount stated to be in the bag, and took the book and bag home. The next day his father died. On Sunday, two or three days after, witness counted the money, and found it to be as stated; deposited the money in the blue chest, and kept it three or four years; then sold the doubloons to Mr. Church, and returned the amount to the bag, where it remained till 1835, and then used the money in the firm of Bown & Seddon, by which means the firm became indebted to his son $1882. Witness did not sign the statement, till the doubloons were sold, when he first carried

(Irwin *v.* Keen.)

out the amount, $320; the bank notes in the bag were of the United States Branch Bank of New York in *tens and fives. The firm first kept a bank book about three years ago; witness paid the identical moneys in the bag out on account of the firm, of which no entries were made on the books of the firm: that his father was a tailor, and set up a small clothing store in New York, on his arrival in this country in 1819. He was sixty-three years old. [*350]

Frances Brown. "I am the wife of Benjamin Brown, and mother of Abraham Brown. I saw my husband bring home the green bag and book two or three day after old Mr. Bown's death. On Sunday, two or three days after, she saw her husband have a roll of notes, some silver, and twenty doubloons; counted the doubloons, saw money several times afterwards in the green bag in the chest. When Abraham Bown was seventeen years old, I took him up and showed him the money in the bag. Old Mr. Bown told me before he died he had sold three houses in England, and had the money when he arrived here. I lived with old Abraham Bown some time in England; he was a tailor; he owned the house he lived in, and the adjoining houses; they were small; I went with him to let one; the chest was kept in the varnish room; the room was kept locked; there was two rolls of notes, some silver, but no doubloons in the bag then. Abraham was twenty-one on the 18th of November, 1835."

On the part of the general creditors, the testimony of Mrs. Lucy Holderness and others was taken, in substance, as follows:

Mrs. Holderness:—"I knew Benjamin Bown, of the firm of Bown & Seddon, and his father, two or three years before he left England, in 1819. Abraham Bown lived in London in a small house; was a tailor, and very poor; there was but one bed in his house; I lived in Portsmouth; two or three years before I left England, I went to London; became acquainted with Abraham Bown; I saw him frequently when in London, two years after my first visit; was still very poor, and lived in the same small house, and making a precarious support as a tailor; he complained of his poverty; he said that his son wanted him to come to the United States, and that he had no money; asked me, as he understood I was going, to pay his passage; I told him I would. Mr. Bown and wife came down to my house at Portsmouth, in a common road wagon, to sail with me; Mrs. Bown was sick for three days on the journey: we sailed from Southampton for France, at my expense; were detained two weeks; during the first week I supported them, but fearing I would not have money enough to pay their passage, he supported himself and wife the second week, but complained of not having enough to satisfy his wants. I paid their passage from France to Phila-

(Irwin *v.* Keen.)

delphia; a few days after our arrival they went to New York. I [*351] never saw *him after. He gave me a receipt for the passage money I had paid for him, which has not been repaid; he was upwards of sixty years old; complained much of his sight. He had no property in England that I ever heard of, but was very poor; was too poor to pay his passage from London; was brought down twice free of expense."

Charles Bray.—"I have known B. Bown twenty years; also William Seddon. About two years ago, Benjamin Bown told me that his father being sick, told him, he would not live long, but would die at a certain hour; that he further told him to open his chest, and take from the bottom a vest, and that he would find in the pocket four sovereigns: that he was surprised to find him worth so much; and did not know he had any thing: that the sovereigns went to bury him. After the assignment, Seddon came to my house, and told me that the debt for which young Bown was preferred, was a cover to protect the property: that the firm did not owe him a dollar: that he had paid for his schooling and clothes: that he had done wrong in executing the assignment, and was willing to suffer for it: that Bown had suggested that they could cover their property by saying that young Abraham Bown's grandfather had left him a legacy which the firm had used; that by this plan the firm could secure the property to themselves: otherwise, all their property would be under execution before night: this was on the 16th June, 1836.; he died on the 25th June, 1836."

Jane Bray.—"After the assignment Seddon came to our house and complained of being deceived and cheated by B. Bown; and said that he had executed the assignment without understanding it: that it had been arranged by B. Bown alone: that Bown told him it was necessary to make the assignment to save them from ruin: that they would protect themselves by preferring his son: that he asked Bown how they could prefer him when they did not owe him a cent; Bown said, we can fix that by making out that Abraham Bown's grandfather had left him a legacy sufficient to cover the amount, and that they had used it in the firm: that Seddon said, how can that be, when Abraham Bown was very poor when he died; Bown said no matter, he had it all fixed; and he, Seddon, executed the assignment: and that it was a fraud upon the creditors."

Peter Curry.—"In the spring of 1836, Mr. Seddon called to see Mr. Parker, and stated in my presence, that the assignment of Bown & Seddon to Wm. Baker was fraudulent: that the preference to Abraham Bown was for $2558; was without consideration, the firm not owing him one cent: that it was done to defraud the creditors. Seddon called upon him to witness his

(Irwin v. Keen.)

declarations, and *he repeated them; they were made [*352] two or three days before his death."

Upon this evidence, the auditor reported, that the preference to Abraham Bown was fraudulent and the assignment void.

He reported also that the assignment to Baker not being, in his opinion, a revocation of the trust in Poulterer, the claimant under the assignment could not contest the conveyance to Poulterer, although the latter was not valid against the judgment creditors.

3d. The auditor reported that the judgment creditors of William Seddon were entitled to be paid out of the fund in the order of date of the respective liens.

The District Court confirmed the report of the auditor, and ordered distribution of the fund accordingly; whereupon an appeal was taken to this Court by William Baker, the assignee.

The following exceptions were filed.

"1. The auditor erred in allowing the assignment to be impeached by evidence tending to show that the preference to A. Bown was fraudulent, without making the creditors interested in its validity, parties to the proceedings before him.

2. In admitting evidence of the declarations of the grantors.

3. In reporting the assignment fraudulent and void.

4. In reporting that the deed of 12th March, 1835, cannot be disputed by the claimants, under the assignment of January 15th, 1836.

5. In not allowing the claim of William Baker, as assignee, &c."

Mr. *Kennedy* for the appellant.

1. The creditors interested in the assignment, ought to have been made parties. An assignee ought not to be obliged to establish the validity of the debt provided for in the assignment.

2. The declarations of Seddon, made after the assignment ought not to have been admitted to affect it. *Chess* v. *Chess*, (1 Penn. Rep. 38); *Hoffman* v. *Lee*, (3 Watts, 352); *Packer* v. *Gonzalus*, (1 Serg. & Rawle, 529.)

3. The auditor ought not to have rejected the claim of the assignee, because the preference of one creditor was alleged to be fraudulent. Baker was entitled to recover the fund for the benefit of those creditors whose debts were undisputed. There was nothing on the face of this assignment to vitiate it. In *M'Clurg* v. *Lecky*, *(3 Penn. Rep. 83,) and other cases, the as- [*353] signment contained notice of the fraud. In *Bradway's Estate*, (1 Ashmead, 212,) it was held by Judge King, that an assignment containing a fraudulent provision for the wife and children of the grantor, was nevertheless good so far as it pro-

(Irwin *v*. Keen.)

vided for *bona fide* creditors. In *Magniac* v. *Thompson*, (1 Baldwin, 344,) it is laid down that to make a contract void under the 13 Eliz. both parties must concur in the fraud. Here the other creditors have not participated in any way. *Cadogan* v. *Kennett*, (2 Cowper, 433); *Wynn* v. *Patterson*, (9 Peters, 679); *Brooks* v. *Marbury*, (11 Wheat. 78). The conveyance to Poulterer was admitted before the auditor to be fraudulent, and Baker the assignee had a right to the property. [KENNEDY, J.—That conveyance may have been void as against creditors; but did the property pass to the assignee, Baker?] In *Englebert* v. *Blanjot*, (2 Wharton's Rep. 240,) this Court overruled the decision of Judge Duncan at Nisi Prius, in *Thompson* v. *Dougherty*, (12 Serg. & Rawle, 443,) and held that an assignee for the benefit of creditors, may set aside a fraudulent conveyance. This Court has also decided that an executor or administrator may impeach a fraudulent assignment.

Mr. *H. M. Phillips*, Mr. *Raybold*, and Mr. *F. W. Hubbell*, contra.

1st. The first exception was not much pressed; and it is too plain for argument that there was no occasion to make the creditors parties.

2d. The declarations of Seddon were clearly admissible. *M'Kee* v. *Gilchrist*, (3 Watts, 230); *Rittenhouse* v. *Rittenhouse*, (1 Rawle, 362); *Rogers* v. *Hall*, (4 Watts, 359); *Price* v. *Tompkins*, (4 Watts, 85.)

3d. It is settled by the case of *M'Clerg* v. *Lecky*, that one fraudulent disposition avoids the whole deed. It is said that the fraud there appeared on the face of the instrument. There is no difference in principle, between the cases, nor in respect to the position of creditors. It might be different in the case of a purchaser for a valuable consideration. *Mackie* v. *Potts*, (Hopkin's Chan. Rep. 395). Then, did the property which had been conveyed to Poulterer pass to the assignee for the benefit of creditors? In *Thompson* v. *Dougherty*, it was held that such an assignee was bound by it and could not invalidate it on the ground of fraud. *Englebert* v. *Blanjot*, was the case of a trustee under the insolvent laws. It is true that the chief justice who delivered the judgment of the Court in that case, said that there was no distinction between a voluntary assignee and a trustee under the insolvent law; yet this may not have been the opinion of the whole Court. [GIBSON, C. J.—The case certainly did not call for any judgment on that question; but the point was considered in the conference of the Judges.] *Regarding it as an open question, it is contended that the conveyance was good against Seddon and his voluntary assignee. The

[*354]

(Irwin *v.* Keen.)

assignment could not be a revocation of the trust deed, since it did not purport to be an execution of the power, and there was other property for it to operate upon. *Allison* v. *Kurtz*, (2 Watts, 188); Sugden on Powers, 328, 374.

*Reply.*—The assignment is of all the estate of the assignor, real, personal and mixed. The fact is, that there was no real estate except this of Seddon. There was a general power reserved to revoke the deed to Poulterer. In *Allison* v. *Kurtz*, Judge Sergeant recognises the English rule that if there is no other property to answer a part of the terms used, except that over which there is a power, it will be deemed well executed, because otherwise it would have no operation. The assignment ought not to have been entirely invalidated. The preferred creditors against whom there is no allegation of fraud, will be prejudiced, because if they had not been provided for in the assignment, they might have obtained judgments and liens on the property.

The opinion of the Court was delivered by

ROGERS, J.—The fund which is in Court for distribution arises from a judicial sale. The money is claimed by J. Poulterer, the trustee, under a voluntary deed, from one of the debtors, William Seddon, in trust for the grantor, and his daughter Mary Seddon; by William Baker, assignee of Brown and Seddon, in trust for certain creditors therein named; and by judgment creditors of the firm of Brown and Seddon, subsequent in date to the assignment.

If, as is stated in the report of the auditor, the deed to Poulterer was a voluntary deed, (and we have no doubt of the fact,) intended to protect his property against the claims of creditors, there is no pretence to say, that he is entitled to any part of the fund. The Court are bound to award the money to creditors of the firm, in preference to him, in payment of debts.

By the deed of assignment, Baker, the assignee, was in the first place to pay nine several creditors, the several amounts due to them; among whom Abraham Bown, the son of one of the firm, was one who was to be first paid; and second, all such other creditors rateably, as should within sixty days execute a release. For the reasons given by the auditor, on a review of the whole evidence, there is no room for doubt, that the pretended debt was a gross attempt at fraud. It is in evidence, that the preference of the son was intended to cover the property of the firm, from the just claims of creditors. But notwithstanding this, it is insisted that the assignee under the deed of the 5th of January, 1836, is entitled to the fund, in trust for the other

(Murphy *v.* Loyd.)

[*355]  creditors, therein named, who executed a release *in accordance with its stipulations. It is contended, that although tainted with much fraud, so far as Abraham Bown is concerned, yet, the creditors were not parties to the fraud, nor was there any thing on the face of the deed to affect them with notice. This argument is not without plausibility; but still, we think, that when a deed is tainted with fraud, no interest passes, as against creditors, whether parties to it or not. This principle is distinctly asserted, in *M'Clurg* v. *Lecky*, (3 Penn. Rep. 94). When the assignment is affected, either with moral or legal fraud, the property does not pass; it remains in the debtor, liable to the execution of creditors. In *M'Clurg* v. *Lecky*, it was attempted to distinguish a legal from a moral fraud. It was conceded, that actual fraud vitiated the whole assignment; but it was contended, that a legal fraud avoided the deed, only so far as to enable the creditor to take in execution the fund specifically applied, to the benefit of the debtor. In other words, that the deed was avoided in part, but not in the whole. But the Court overruled the distinction, on the ground of policy.

The assignee represents all the creditors, and is bound to protect their rights. There is nothing therefore in the objection, that they are not parties to the controversy.

We are further of the opinion, that the declarations of the grantor, Seddon, were properly received; but aside from the testimony derived from that source, there was enough to show the fraudulent character of the deed of assignment.

In this view, whether the deed of the 12th March 1835, can be disputed by the claimants under the assignment of the 15th June, 1836, is wholly immaterial. The decree must be affirmed.

Decree affirmed.

Cited by Counsel, 6 Watts & Sergeant, 98; 3 Barr, 87; 2 Wright, 451.
Cited by the Court, 2 Ashmead, 330; Brightley, 264.

---

[*356]            *[PHILADELPHIA, FEBRUARY 17, 1838.]