JUNE TERM, 1849.

## WILLIAM J. ALBERT, AND EMILY J., HIS WIFE, *vs.* WILLIAM WINN, JAMES ROSS, ET AL.

A bill was filed in chancery on the 14th of September 1846, by the creditors of *J*, alleging his insolvent condition, and that he designed to give an undue preference to certain of his creditors, especially *A and wife*. Upon this bill an injunction was granted, restraining *J* from giving, and *A and wife* from receiving, any such preference. On the 29th of the same month, *A and wife* filed a bill on the equity side of *Baltimore* county court, alleging *J's* indebtedness to them on account of his misapplication of certain

trust funds belonging to the wife of *A*, and his promise to secure them by a conveyance of certain real estate, which he had failed to do, and praying that he might be decreed to pay them the sum thus due under the trust. *J* answered this bill, admitting its averments, and on the 31st of October following, a decree was passed by *Baltimore* county court, directing *J* to bring into court the amount ascertained and admitted to be due to the complainants. HELD:

That the original bill of the 14th of September, drew to the court of chancery the whole litigation in regard to the distribution of *J's* estate; that the proceedings of *A and wife*, in *Baltimore* county court, were in violation of the chancellor's injunction, and that it was competent for the court of chancery to restrain, by injunction, the execution of this decree, and treat the whole proceeding in said county court as a nullity.

The case of *Ellicott vs. U. S. Insurance Company, ante* 307, is distinguished from this case, and is not in conflict with it.

The appropriate remedy for *A and wife* was, in chancery, on the original bill, that court having ample power to afford them the relief which they sought in another form, in another court of concurrent jurisdiction.

In this case the court decided, that a deed conveying all the grantor's property to certain trustees, in *trust :* 1st. To defray the expenses attending the execution of the trust. 2nd. To the payment of the several creditors named in the schedule annexed to the deed. 3rd. To the payment of the claims of such creditors as shall, on or before a given day, execute and deliver to the trustees full and absolute releases and acquittances of such claims; and 4th. If any surplus shall remain, to apply the same to the satisfaction of the claims of all other creditors of the grantor, without distinction or priority, was fraudulent and void, both at common law, and under the statute of the 13*th of Elizabeth.*—[*See note at the end of the case.*]

Upon review of all the authorities, it was the opinion of the court in this case, that a deed which does not fairly devote the property of the debtor, in desperate circumstances, to the payment of his creditors, but prescribes to them the terms upon which they shall receive part payment, is, in law, fraudulent and void.

Where a conveyance is good in part and bad in part, as against the provisions of a statute, it is void *in toto*, although there be no fraud intended.

APPEAL from the Court of Chancery.

On the 14th of September 1846, *Johns Hopkins and others,* creditors of *Samuel Jones,* filed a bill in chancery against said *Jones,* the appellants, *Albert and wife,* and one *Michael S. Norman,* alleging that *Jones* who had been trading under the name of *Talbot Jones & Co.,* was indebted to the complainants and others, in the large sum of $200,000, whilst the whole of his assets did not amount to more than $100,000;

that being thus hopelessly insolvent, and knowing himself to be so, and having no reasonable expectation of being exempt from liability or execution, on account of his debts, without applying for the benefit of the insolvent laws, and designing and threatening to prefer certain of his creditors, his near relations, said *Jones* was about to transfer a large portion of his property to his brother-in-law, and sister, *(Albert and wife,)* and to said *Norman,* also his brother-in-law, with the intent thereby to give them an undue and improper preference over the rest of his creditors. That complainants being about to institute suit against *Jones,* to compel him to apply for the benefit of the insolvent laws, he had changed his residence, that he might the longer delay his creditors, and better secure to his favorite creditors, the preferences which he contemplated. The bill then proceeds to state, of what the property and effects of said *Jones* consisted, and prays that a receiver may be appointed, to take charge of the same, until a trustee in insolvency should be appointed, and for an injunction to restrain said *Jones* "from conveying, assigning or transferring, any of his property or effects, rights or credits, to the said *Albert and wife,* and *Norman,* to secure or pay the debt due to them, in preference to the rest of his creditors, and to restrain the said *Albert and wife* and *Norman,* from receiving any such preference."

Exhibits of the indebtedness of *Jones,* being filed with the bill, it was on the same day submitted by the register, to *Cornelius McLean* a solicitor in chancery, (the chancellor himself being absent,) who endorsed thereon as follows: "I have read this bill and think that an injunction ought to issue.—*Cornelius McLean,* solicitor."

The injunction was then issued as prayed, and served upon the defendants; and the granting thereof was approved by the chancellor, (BLAND,) on the 8th of October 1846, by order, endorsed upon the bill.

On the 29th of September 1846, the said *Albert,* and *Emily his wife,* filed a bill on the equity side of *Baltimore* county court, against said *Samuel Jones,* alleging that complainant, *Emily,* was *cestui que trust,* under the will of her late father *Talbot Jones,* of a large amount of stocks and other property;

which the said *Samuel* held as trustee for her use, a large portion of which property he had appropriated to his own use; that the amount of this trust fund for which said *Samuel* was responsible to complainant, was $24,319.34. That in November last, complainants applied to said *Samuel* to replace this trust fund, or to substitute for it property of equal value, and that he then promised and pledged himself, to grant and convey to your oratrix *Emily*, certain property known as the "*Wheatfield Inn*," which conveyance has never been made. This bill then prays that said *Samuel Jones*, may be decreed to pay to the complainants the sum of money thus due to them under said trust, and misapplied by him to his own purposes. On this bill a *subpoena* was issued and served upon the defendant, and made returnable on the 1st of October then next, on which day *Jones* appeared by counsel, but failing to answer, an interlocutory decree, under the act of Assembly, was passed on the 6th of October, and on the same day a commission to take testimony was issued, under which various testimony in relation to the trust fund and the amount thereof, was taken, and returned on the 8th of the same month.

On the 22nd of the same month, (October 1846,) the same parties, *Albert and wife*, filed a second bill in the same court, against the same defendant, *Jones*, of the same import as the first, respecting the debt due on the trust fund; and further charging, that said *Jones*, being largely indebted, is about to convey to trustees, for the benefit of such of his creditors as will give him releases of their claims, all his property, including the "*Wheatfield Inn*," upon which complainants claim an equitable lien for the reasons stated in their former bill. This bill then prays for an injunction restraining said *Jones* from conveying to any person or persons whatever his property and effects, and especially the "*Wheatfield Inn*." An injunction was, on the same day, issued as prayed, which was afterwards, on the 26th of the same month, by agreement, modified, so as to affect only the "*Wheatfield Inn*" property.

On the 30th of the same month, (October 1846,) *Jones* answered the first bill of *Albert and wife*, admitting his indebtedness to the complainant, his sister *Emily*, and his appropriation

57    v. 7

of her trust money, and his promise to reinstate the same by a conveyance of the "*Wheatfield Inn;*" and further stating, that since the filing of this bill he had conveyed all his property, except said "*Wheatfield Inn,*" to *James Ross and William Winn,* "for the general benefit of his creditors." The court, (Le Grand, J.,) on the next day, (31st of October 1846,) passed a decree, directing *Jones* to bring into court forthwith, the sum of $24,319.34, to be paid to complainants, for the use and benefit of the said *Emily J. Albert,* and the other *cestuis que trusts* mentioned in the will of *Talbot Jones,* deceased.

On the 4th of November following, *Winn* and *Ross* filed their petition, praying the court to strike out the above decree, and that they might be made parties defendants to the bill. This petition states, that *Jones,* on the 26th of October last, conveyed by deed, all his property, except the "*Wheatfield Inn,*" to the petitioners, for the benefit of his creditors generally, and had covenanted to convey that property also, as soon as the injunction forbidding him to do so should be dissolved, and therefore the petitioners are interested in the object of said bill. This petition also discloses the fact of the filing of the bill in chancery, of the 14th of September 1846, by *Johns Hopkins,* and others, creditors of said *Jones,* and the granting of the injunction thereon, and charges, that the bill in this case was filed, and the proceedings thereunder were had with a fraudulent intent and design to evade said injunction of the court of chancery, the existence of which was purposely concealed by the parties, from the knowledge of this court. It further states, that *Jones* expressly agreed, on the 28th of October, with the solicitor of your petitioner, that his answer should not be filed before the ensuing Saturday morning, at 1 o'clock, and that this delay was asked and granted for the avowed purpose of enabling your petitioners to obtain a copy of the deed executed by *Jones* to them, in order that it might be made the foundation of an application by them to be made parties defendants therein.

*Jones,* by his answer to this petition, denies all fraud or concealment, and in regard to the agreement respecting the filing

of his answer, states, that he considered the delay asked for, was merely for the purpose of procuring a copy of the deed to be filed with his answer, and having afterwards learned from *Mr. Glenn*, one of his counsel, that this was unnecessary, he filed his answer, simply stating the fact, that he had made the deed. The complainants, *Albert and wife*, also deny all fraud and concealment, and aver their entire ignorance of any agreement or understanding respecting the filing of *Jones'* answer.

On the 19th of December 1846, the court, (LE GRAND, J.,) passed an order, dismissing this petition, and delivered the following opinion:

"The petition states, that the petitioners are trustees, under a deed executed by *Jones* for the benefit of his creditors, and asks that the decree heretofore passed in the cause may be opened, and the petitioners made parties thereto. The bill was filed on the 29th September last. It alleges in substance, that by the last will and testament of *Talbot Jones*, deceased, (father of the complainant, *Emily J.,*) a trust was created in her behalf, and that the defendant *Jones*, as surviving trustee of the said *Emily*, used for his own purposes the trust fund, and that he promised after the application of the fund to his own purposes, to secure the same to the complainants, by the conveyance of a certain property in the city of *Baltimore*, known as the " *Wheatfield Inn*," but he has never made such conveyance in compliance with said promise. The bill then prays, as for relief, that the court will decree the payment by *Jones*, of the amount so misapplied to his own uses, which is set out and declared in the bill. There is no prayer for the specific performance of the alleged contract of *Jones*, to convey the " *Wheatfield Inn*." Subsequently an interlocutory decree was passed, and testimony taken under it. On the 30th of October, *Jones* filed his answer, in which he admits the bequests as contained in the will of his father, and stated in the bill, and that "he used the stocks and moneys as alleged in said bill, belonging to the said *Emily*, and so held by him in trust," he also admits the agreement to convey the " *Wheatfield Inn*" as stated in the bill, and he submits to such decree in the premises, as this court may make. On the 31st of

October, this court signed a decree. On the 4th November, on the petition of the petitioners, *Ross* and *Winn*, this court passed an order suspending said decree, until its further order. By the petition and accompanying copy of the bill, it appears that *Johns Hopkins* and other creditors of *Jones*, filed their bill in the court of chancery, on which an injunction issued, enjoining and prohibiting the said *Jones* from conveying, assigning or transferring any portion of his property or effects to the said *William Albert*, or *Emily his wife*, or to any other of the creditors of *Jones*, or to any one in trust for them, to secure or pay the debts due from *Jones* to them, &c. This bill was filed on the 8*th October* 1846. On the 22nd October, on another bill, this court enjoined *Jones* from conveying his property to any one. On this state of the case, counsel have argued many questions, which, with all respect for their opinions, do not appear to the mind of the court, to be involved in the proceeding. It will be time enough to consider them when they properly arise. It is insisted by counsel for petitioners, that owing to the fraud and concealments of the complainants and defendants, this court was not informed of the interest of the petitioners in this proceeding, and this allegation rests upon the fact of an arrangement having been entered into by the defendant *Jones*, and one of the counsel of the petitioners, that he, *Jones*, would not file his answer before a certain day. So far as the complainants are concerned, they not only deny all fraud and concealment, but aver they were ignorant of any such agreement or understanding, and there is not a particle of testimony to show the contrary. *Jones* also denies fraud, and shows what he considered the meaning and purport of the agreement. On these facts, there might possibly be made out a case of mistake, but not of fraud.

It has also been contended, that this proceeding has been in violation of the injunction issued by the chancellor; if this be so, this court is unable to perceive the fact. The injunction only prohibited *Jones* from giving, and the complainants from receiving from him a conveyance of any of his property, &c. There has been no such conveyance by *Jones;* all that has been done by the complainants, is the prosecution of a suit,

commenced before the high court of chancery was applied to
by the creditors of *Jones*. How this can be considered an in-
fraction of the injunction, it is impossible to perceive. It
might, however, be a very serious question, whether these peti-
tioners have not violated that injunction by taking the deed
from *Jones* before the injunction was dissolved; and if they
have, then it is manifest they have no standing under that
deed in any court: but as this question is not necessarily in-
volved in this case, the court will avoid the expression of any
opinion in regard to it. Did however the court consider the
other creditors of *Jones* entitled to be made parties to this
suit, it would be compelled to consider and decide on the valid-
ity of the deed to *Jones;* but regarding the proceedings as but
an ordinary one, in which the *cestui que trusts* are only seek-
ing to compel the trustee to make good the funds which he
has misapplied, it is difficult to perceive what other parties have
to do with it. The amount of the debt is alleged in the bill,
and is admitted, as is also the misapplication of the trust fund,
in the answer. Had a suit been instituted at law, on a mat-
ter perfectly cognizable by it, for instance, on a promissory
note, the defendant admitting his handwriting, how would
such court receive the opposition to the rendition of a verdict
by a jury, for the amount of the note, on the ground, that the
defendant had other creditors, and that he was unable to pay
all the full amount due to them ? Would such a defence,
either from the defendant, or from third parties, be listened to?
To such a question no answer is required, for it answers itself.
The judgment would be entered up on the verdict, and those
who thought they could deprive it of its efficiency, would have
to institute proceedings to that end. To the mind of the court,
this case involves precisely the same question.—If *Jones* ever
becomes an applicant for the benefit of the insolvent laws, his
permanent trustee may, if he thinks he can do so successfully,
call these complainants to an account, on the ground that they
have received an undue and improper preference; but until
such an event occurs, this court knows of no right in one cre-
ditor to object to another obtaining a decree or judgment in the
regular course of judicial proceeding. But it has been sup-

posed and so argued, that this decree has not been obtained regularly, that is to say, the case was never submitted. The answer admits all the facts in the bill, for which the bill prays a decree, and submits to the court to pass such a decree as it deems proper. If such a proceeding requires to be set down for hearing, then at least one-half the decrees passed by this court are erroneous. But the practice has been uniformly different. Where there is no denial of the equity stated by the bill, and submission to a decree in the answer, the court has always, so far as I know, and from inquiry have been informed, considered the case ready for decree. Such the court considered this case to be, and dealt with it accordingly. The decree has been drawn up inartificially, and requires some slight reformation, which will be made *nunc pro tunc*. It was in the bosom of the court from the day it was signed, the court having promised *Mr. Dulany* so to consider it on the day it was signed. Entertaining these views, it is thereupon ordered, this 19th day of December A. D. 1846, that the petition of *Ross* and *Winn* be, and the same is hereby dismissed with costs.''

On the 13th of January 1847, *Winn* and *Ross*, and the complainants in the original suit of *Hopkins and others*, of the 14th of September 1846, filed their bill in chancery against *Albert and wife, Jones* and others, stating the object of the original suit, and the injunction thereon, and the subsequent proceedings of *Albert and wife* in *Baltimore* county court, resulting in the decree of that court, of the 31st of October 1846, and seeking to set aside the same as fraudulent and void against the complainants, and to stay, by injunction of the court of chancery, execution thereof, against any property of *Jones*. This bill sets forth the deed of *Jones* conveying to *Winn* and *Ross* all his property, for the benefit of his creditors, and avers, that the same is valid and operative, and vests the title of all of *Jones'* property in said trustees. It avers, that the decree of *Baltimore* county court was fraudulently obtained, and designed and contrived, to give to the parties obtaining it, an undue and improper preference over the rest of the creditors of *Jones*. It prays, that the " *Wheatfield Inn*," as well as the rest of the property of said *Jones*, may be declared charged, in the hands

of the trustees, with the payment of the debts, as expressed in the deed, and that the trustee may be permitted to account for the trust property under the direction of this court, which the bill asks shall assume jurisdiction over the whole subject, with a view to the distribution of the estate amongst the creditors, upon just and equitable principles. It also states, that *Jones* had applied for the benefit of the insolvent laws, on the 11th of January 1847, and that a provisional trustee had been appointed.

The deed of *Jones* to *Winn* and *Ross*, is filed with this bill as an exhibit. It is dated the 26th of October 1846, and conveys to the grantees, "all the property, estate and effects whatsoever," of the grantor, except the "*Wheatfield Inn,*" *in trust*, to sell the same, and apply the proceeds as follows: "*First*, to defray the costs and charges attending the execution of this trust, including a commission of eight *per cent* on the amount collected, to be retained by the trustees for their trouble in executing this trust." "*Secondly*, to the payment to the several creditors named in the schedule hereunto annexed, of the sums of money thereby admitted to be due to them respectively, the aggregate of said sums amounting to $4801.33;" and "*thirdly*, to the payment of the claims of such of the creditors of the said *Samuel Jones, Jr.*, (whether contracted by him in the prosecution of his aforesaid trade, or otherwise,) as shall, on or before the first day of January next, execute and deliver to the said trustees, full and absolute releases and acquittances to the said *Samuel Jones, Jr.*, of and from the aforesaid claims, and if the proceeds of the aforesaid funds, remaining after satisfaction of the preceding trusts, shall prove unequal to the payment in full of the claims of the creditors releasing as aforesaid, then the same proceeds shall be distributed amongst such creditors so releasing, ratably and proportionably to the amounts of their respective claims, and if any surplus shall remain, after satisfying the aforesaid creditors, then, *fourthly*, to apply the same surplus to the payment and satisfaction of the claims of all the creditors of the said *Samuel Jones, Jr.*, without any distinction or priority whatever." It also contains a covenant on the part of *Jones*, that, whenever the injunction restraining the transfer of the

"*Wheatfield Inn*" shall be dissolved, he will convey the said property to the same parties, "to be held by them upon the same trusts, and with the like powers, as the estate and property hereby conveyed."

An injunction restraining further execution of the decree in *Baltimore* county court, was then issued as prayed.

The answers of *Jones*, and of *Albert and wife*, to this bill, deny all fraudulent combination charged in relation to the proceedings in *Baltimore* county court, and aver that the decree of that court is valid and effectual, as a decree of a court of competent jurisdiction, fairly and *bona fide* rendered, and that it can only be annulled, if there be error in it, upon appeal to a superior tribunal. The answer of *Albert and wife*, also denies the validity of the deed executed by *Jones* to *Winn* and *Ross*, on the 26th of October 1846.

On the 18th of January 1847, *Albert and wife* filed their answer to the original bill of *Johns Hopkins, and others*, alleging the same facts in defence, as they had before averred in their bill of complaint in *Baltimore* county court.

On the 28th of April 1847, the complainants, *Winn* and *Ross*, filed their petition in the cause, stating, that since the filing of their original bill on the 13th of January 1847, they had been appointed permanent trustees of said *Jones*, and praying leave by an amended or supplemental bill, to set out their title as such permanent trustees.

This petition was resisted by the defendants, but the chancellor, (Johnson,) on the 30th of April 1847, passed an order, permitting a supplemental bill to be filed without prejudice to the injunction already issued, but with liberty to the defendants, after filing their answer to such supplemental bill, to move for a dissolution of the injunction upon five days' notice.

A supplemental bill was accordingly filed, and upon the coming in of the answers, a motion was made to dissolve the injunction, upon the hearing of which motion on the 1st of December 1847, the chancellor passed an order continuing the same until final hearing, or further order.

From this order the defendants, *Albert and wife*, appealed to this court.

The two opinions of the chancellor *(Johnson,)* in this case, one delivered upon the application for leave to file a supplemental bill, and the other upon the motion to dissolve the injunction, will be found reported in the *2nd vol. Maryland Chancery Decisions,* 42.

The cause was argued before DORSEY, C. J., MAGRUDER, MARTIN and FRICK, J.

By DONALDSON and NELSON, for the appellants, and
By ALEXANDER and DULANEY, for the appellees.

MAGRUDER J., dissented and delivered the following opinion :

In determining any question which can properly arise upon this appeal, it is certainly not necessary to inquire what would have been the equities of these parties, and in what *forum* these equities must have been adjusted, if *Samuel Jones*, one of the appellants, had not become an applicant for the benefit of our insolvent laws: Although if no such application had been made, or if, notwithstanding such application, such of the insolvent's creditors as had judgments or liens upon his property, were still at liberty to proceed, in our courts, as they might have proceeded, had no such application been made, the law or equity of their case might be very different, yet then, as well as now, we should be met, *in limine*, with the question: Whence the power or jurisdiction of our court of chancery, to interfere, by its injunction, with the decrees of other equity courts, possessing in the premises all its equity jurisdiction?

"The maxim," says chancellor *Sanford*, (1 *Hopkins* 79,) "that every right has its remedy, and that where the law does not give redress, equity will afford relief, however just in theory, is subordinate to positive institutions and cannot be applied, either to subvert established rules of law, or give to the court a jurisdiction hitherto unknown." Again, p. 85: "The maxim which teaches, that a judge should amplify his own jurisdiction, has no place in our institutions. The utility of this court, (chancery,) so important in the general structure of our system, will be best consulted and preserved, by preserving its jurisdic-

tion within the limits that are now established." Is the power to grant the injunction, which was granted in this case, within those limits?

There was a time, when the jurisdiction of chancery to give relief, even after a judgment at law, was gravely questioned. It has, however, been long settled, both here and in *England,* that injunctions might be issued for such purpose. But can such relief be had in all cases? Not if there was always in the case, a prompt and adequate remedy at law; nor for a matter of which the defendant might have availed himself at law, 1 *John. Ch. Rep.,* 51. In *Matthews vs. Joer,* 9 *Wheaton,* it was said: "A question decided at law, cannot be reviewed in a court of equity, without the suggestion of some equitable circumstance, of which the party could not avail himself at law. Were a court of equity, in a case of concurrent jurisdiction, to try a cause already tried at law, without the addition of any equitable circumstance, to give jurisdiction, it would act as an appellate court, to affirm or reverse a judgment already rendered, on the same circumstances by a competent tribunal." See also 2 *Hen. & Mumford, p.* 146, and 1 *Johnson's Ch. Rep., p.* 95.

But upon what ground can the chancery court, meddle with a decree and proceedings in a case in the county court, as a court of equity? It must not be said that it possesses this power, because it always had concurrent jurisdiction with the county court, and having first got possession of this case, therefore it has a right to act upon the whole subject? This is not sustained by the record. The bill upon which the assertion is made to rest, *if indeed it was properly before us,* was to prevent *Jones* from conveying to the other defendants therein named, any of his property, thereby giving an undue preference to them: and asking, too, for a receiver. This surely is not the commencement of a suit, which impeaches a decree of another court, and asks the chancellor to take jurisdiction of a trust. But if, in truth, the first bill gave to the chancery court all the jurisdiction which we are told it thereby acquired, is a second injunction the proper remedy for a breach of the first? The complainants ought to have sought relief *in the first suit,*

before the application of the insolvent, it must have all the by applying for an attachment of contempt, and not by a second original bill, which surely is no supplement to the first.

But even if every thing thus far insisted upon be admitted, of what advantage will it be to the appellees? It must be granted, that when two courts have concurrent jurisdiction, the plaintiff ought not at the same time to proceed in both courts, for the same thing. If he should, and the suits be pending in courts of common law, the defendant may plead *in the second suit*, the pendency of the former action, and thereby defeat the second action. In equity, however, it is quite different. If the complainant has two suits pending against the same defendant for the same thing, the court upon application will put him to his election, and oblige him to dismiss, *not his first suit, but the one or the other.*

Equally groundless is the notion, that the complainants here have a right to object, that the defendants are the complainants in the county court. The complainant ought indeed to confine himself to one court, but the defendants, if they have a cause of action, (especially if it be not against the same complainants, as is the case here,) may select any court, whether of law or equity, which has jurisdiction. Here the controversy in the county court, is not with the same persons, or for the same thing; the decree, in either case, would not be evidence in the other; the rights of no stranger to the suit would be prejudiced by such decree, but as this court has often said, such a decree is fraudulent and void, as to all such parties.

But the obvious answer to all that has been said in this case, upon the subject of concurrent jurisdiction, is, that the debtor has elected to ask the relief which our insolvent laws offered to him. Upon this application being made, and the trustees being appointed, the act of 1805, chap. 110, says, *the county court* shall direct the trustee to sell and convey the property conveyed to him, as they, (the county court,) shall think most for the advantage of the creditors, and the produce shall be distributed among the creditors, after satisfying all incumbrances, judgments and liens. For this court's exposition of this law, see the case of *Alexander vs. Ghiselin, 5 Gill,* 138.

The appointment of permanent trustees, being made known to the chancellor, by the last bill of the appellees, there could exist no ground for the continuance of this injunction, and no reason for asking a continuance of it, as the complainants in the suit in the county court, could not proceed at law to execute their decree, and the court which passed it, and which, in virtue of the debtor's application, has the exclusive administration of all his assets, could of course hinder any proceedings under a *fi. fa.*

The complainants in their several bills of complaint, assume that the deed of trust, which several of *Jones* creditors obtained from him, may be impeached by others of the creditors. As yet however, none of the creditors whose right it is, have thought proper to impeach this deed. Surely no law gives to the chancellor the power *ex officio*, to declare it either void or valid. In answer to a remark once made to *Lord Redesdale,* (1 *Sch. & Lef.,* 204,) that great injustice had been done to the complainant, he very correctly said: "It is not sufficient to show that injustice has been done, but that it has been done under circumstances which authorise the court to interfere." Who having the right to do it, has asked the chancery court to declare this deed of trust to be fraudulent? A deed, though it be actually fraudulent as to creditors, can never be adjudged to be so, until it is impeached in a proper form, in a proper place, at a proper time, and by proper persons. A court has no more right to assume jurisdiction, than to decline to exercise that which the Constitution and laws give to it.

Whenever this deed of trust is to be impeached, who are to impeach it? Unquestionably, this is among the duties of those whose duty it is to collect, sue for and distribute the funds, answerable for the insolvent's debts. Are they before us? Yes, in three distinct characters; and in all of these characters they pray the court to adjudge this deed to be, (not void, but) valid. Upon such a bill, in the absence of many of those, who are interested in the result, can the court entertain the question, and undertake to decide that the deed is fraudulent or valid? Can these parties give to the court jurisdiction, which the law denies to it? As trustees appointed by the

court, on the application of the insolvent, it seems to be their duty to impeach the deed, if it is to be impeached at all; *but,* as the trustees named in the deed of trust, it is their duty to attempt to uphold it. They have their own reasons, it would appear, for preferring to discharge the latter, and, of course, for violating the former duty; and they turn away from the court, by which they were appointed, to which alone, as trustees of the insolvent, they have to render any account, by which alone they may at any time be removed for misconduct, and pray a court, which can exercise no control over them, in that character, to take jurisdiction, and to counsel them in the execution the trust. Can this be endured?

It must be seen, that I do not regard this case as presenting a mere question of *meum* or *tuum*, in which the parties litigant, alone, have an interest. It may be good or bad policy to give to debtors, in failing circumstances, a right to prefer one creditor to another. This, however, is a question to be decided by the legislature, and the safety and welfare of this community require, that the judiciary be prevented from meddling with it. The Court of Appeals never can be a court deeply read in chancery law? The utility of an appeal from chancery to that tribunal, consists, in a great measure in this, that thereby all the extension of its jurisdiction, under the pretence of carrying out some of those "maxims of equity," which in olden times were adopted by that court, (and which will admit of an interpretation, which will enable it, to render other courts, and even the legislature, useless,) may not be extended. A distinguished chancellor of *New York*, speaking of a power attempted to be given to his court, and not more to be dreaded than this, remarks :—"Should this court take cognizance of these cases, they would form a chapter of jurisdiction far more ample than any one which it now possesses; and the assumption would be a bolder stride of power than was ever made by the *English* chancery in any age." The chancellor once had the power which it is thought he may exercise in this case, but it was deemed wise to take it from that officer, and confide it, we have been told by this court, to others *exclusively.* We must all be content to do as much of the State's work, as it is

made our duty to do, and to do no more. It is denied that the chancellor has any right to decide any of the questions, which, in this case, it seems, were put to him. At a proper time I opposed the doctrine, that the powers of the county court, confided to it by our insolvent laws, are to be exercised, subject to no right of appeal to this court.—(See *ante*, 164.) Such, however, is the law of this court, as far as its own decision can settle it;—and if this court has no appellate jurisdiction in such cases, I cannot admit that it has a right, in this indirect mode, to counsel, or it may be, instruct, the county court, what securities are good and what are void, what constitutes a part of the trust fund; what debts are to be paid by order of the county court.

It is a new idea to me, that in a case in which two courts possess co-ordinate jurisdiction, either has a right to determine, under any circumstances, whether the other can rightfully exercise jurisdiction.

It is possible that the law of this case might be in some respects different, if the trustees appointed by the court, and those named in the deed, had not been the same persons, and other views of the case might be taken, if these two classes of trustees could appear to a suit, the one as complainant, the other as defendants. But this case presents no opportunity for such discussions. They are the same persons; the property conveyed by the deed of trust is answerable, at all events, for some of the debts due by the insolvent. If that court can be ousted of any portion of its exclusive jurisdiction, how can it be said that the legislature of *Maryland* is one of those departments of governments, with whose powers the judiciary cannot meddle? If we look at our insolvent system, we shall find that the county court is to limit the time for creditors to bring in their claims, to direct issues on contested claims, and is vested exclusively, with other powers, without which the trust fund, and amount of indebtedness, cannot be ascertained. Now if the county court possesses all those powers, and the chancery court may, by injunction, restrain that court in the exercise of them, because it is imagined to have obtained jurisdiction over the whole subject by reason of some proceeding instituted in it

powers given to the county court, or it is in the situation in which it sometimes supposes other courts to be, and thereby furnishes itself with a pretext for interfering with other courts. *It cannot afford complete and adequate relief.* The power of the county court, to adjudge the decree to be void or valid, surely cannot be questioned in a court, which decided in the case of *Carter and wife vs. Dennison, ante,* 157, that its decision, be it right or wrong, could not be questioned elsewhere,—its decision, that the mortgaged premises were answerable for a portion and but a portion, of the debt, notwithstanding the transaction was tainted with usury.

The question on which the two courts below seem so widely to have differed, (which had jurisdiction first,) according to my understanding of chancery law, is one of very little importance. That court never dismisses a bill because of the pendency at the same time of another bill between the same or different parties. If there be found two suits, both of which ought not to be pending at the same time, it may be said of that court, (it is otherwise in a court of common law,) that it never inquires which was first instituted. Most of the cases with which the books furnishes us, relate to cases, both of them pending in the same court; yet the defendant can never insist, that the one which was brought the last should be dismissed, The court of chancery never can put the complainant to his election, and insist that he dismiss a suit elsewhere, unless if the two suits were pending in that court, it could pass an order, that he elect which of the two suits he will dismiss. It can only enforce the order, by dismissing the suit in its own court, if the complainants refuses or omits to dismiss the suit pending elsewhere.

Much that has been said in this case might have been left unsaid, if it had not been taken for granted, that the mode of proceeding in equity was the same as that at common law. The fact is, that chancery is constantly acting in direct opposition to this, supposed to be, one of its established rules of practice. In the case of a creditor's bill, as soon as a decree has been made directing an account, all the creditors—those who had suits pending *before* the bill was filed, and those who instituted them *after* the filing of the bill—may be restrained from

proceeding at law. 1 *Story*, *sect.* 549.   So when a party to a suit at law, asks for a discovery to enable him to try the action at law, chancery will not only enable him to obtain the discovery, but will frequently go on to give him relief, and thus oust the court of law of its jurisdiction. 1 *Story*, *sect.* 64.   As yet there is no law known in chancery like that which it is contended required the appellants, or any of them, to file in chancery the bill which the record tells us was filed in the county court.

I can discover no ground for a continuance of this injunction.   I certainly can discover no propriety in any case, of deciding any question which is not properly before the court.

With respect to very much that has been said in the course of this discussion, my answer to it is, "I am not called upon to say, that this is not a proper subject for the interposition of the legislature.   The argument that justice requires some new remedy in these cases, is an argument addressed to the legislature, and not to the courts of either law or equity."

FRICK, J., delivered the opinion of this court.

On the 14th day of September 1846, *Johns Hopkins* and others, creditors of *Samuel Jones*, filed in the court of chancery their bill of complaint, against *Jones*, *William J. Albert and wife*, and one *Michael S. Norman*, in which it is alleged, that *Jones* being hopelessly insolvent, and knowing himself to be so, and having no reasonable expectation of being exempt from liability or execution on account of his debts, without applying for the benefit of the insolvent laws, and being in fact under expectation of applying for the benefit of said laws, and designing and threatening to prefer certain of his creditors, his near relations, was about to convey and transfer a large portion of his property and effects to his brother-in-law and sister, *Albert and wife*, with intent thereby to give to them an undue and improper preference over the rest of his creditors.   That the complainants being about to institute suit against *Jones*, to compel him to apply for the benefit of the insolvent laws, he had changed his residence, that he might the longer delay his creditors, and better secure to his favorite creditors the prefer-

ences which he contemplated. The bill, therefore, prays for an injunction to restrain *Jones* "from conveying, assigning or transferring any of his property or effects, rights or credits, to the said *Albert and wife*, to secure or pay the debt due to them in preference to the rest of his creditors; and to restrain the said *Albert and wife* from receiving any such preference." The injunction was accordingly granted, and still continues in force.

*Jones* had previously carried on business in the city of *Baltimore*, under the name of *Talbot Jones and Company;* and on the 5th of September 1846, he suspended payment. Among the debts due by him, was a large sum of money belonging to his sister, (who afterwards intermarried with *Albert*,) which he held in a fiduciary character, as trustee for herself and her children, and which he had appropriated and misapplied to his own use. In the month of November 1845, *Albert* had applied to him to reinstate this sum, or to give security to that intent, when *Jones* agreed to convey to *Albert and wife*, a certain property in the city of *Baltimore*, called the " *Wheatfield Inn*," and other property of the said *Jones*, with a view to such security of the moneys so misapplied by him. But this agreement was never executed.

On the 26th of September 1846, after the service of the injunction, *Jones* convened his creditors, explained to them his condition, and offered and agreed to convey all his property to trustees for their benefit, upon the condition and consideration of a release, to be executed by them, of all claims against him. But at this meeting, *Albert*, who attended, refused to concur, insisting, that the trust debt due to himself and wife, ought to be first secured and preferred over the claims of the other creditors. The proposed arrangement therefore failed, and no deed was executed at that time.

On the 29th of September, *Albert and wife* thereupon filed their bill on the equity side of *Baltimore* county court, pending the injunction granted on the preceding bill, alleging the violation of the trust on the part of *Jones*, and his promise to protect the interests of his sister, by a conveyance of the " *Wheatfield Inn*," and his failure so to do, and praying that he may be

decreed to pay to them the sum of money thus due to them under the trust, and misapplied by him to his own purposes.

On the 1st day of October, the return day of the subpœna, which was regularly served, *Jones* appeared by counsel; and on the 30th of October, having filed his answer, admitting the appropriation of the money, and his promise to reinstate the fund by the security proposed, a decree was passed on the day following, (31st October 1846,) directing *Jones* to bring into court the amount ascertained and admitted to be due to the complainants.

Previous to this decree, on the 22nd of October 1846, *Albert and wife* had filed a second bill on the equity side of the same court, of the same import as the first, alleging, moreover, the intention of *Jones* to make a conveyance of his property for the benefit of his creditors, and praying an injunction to prevent him from conveying for this purpose the " *Wheatfield Inn,*" which injunction was accordingly granted.

On the 26th of October 1846, *Jones* executed a conveyance of all his property, (with the reservation of the " *Wheatfield Inn,*" which was excepted from said conveyance,) to *Ross* and *Winn*, in trust :—

1. To defray the expenses attending the execution of the trust.

2. To the payment of the several creditors named in the schedule annexed to the deed.

3. To the payment of the claims of such of his creditors, as shall, on or before a given day, (the 1st day of January next,) execute and deliver to the trustees, full and absolute releases and acquittances of such claims.     And

4. If any surplus shall remain, after satisfying the aforesaid creditors, to apply the same to the satisfaction of the claims of all other creditors of said *Jones*, without any distinction or priority.

In the same conveyance he also covenanted to convey to the said *Winn* and *Ross* the " *Wheatfield Inn,*" whenever the injunction, before alluded to, should be dissolved, or as soon as he can legally do so, to be held upon the same trusts as the other property conveyed to them.

On the 11th of January 1847, *Jones* made his application for the benefit of the insolvent laws, and *William Winn* and *James Ross*, the trustees under the conveyance, before referred to, were afterwards duly and regularly appointed his permanent trustees.

On the 13th of January 1847, *Winn* and the parties complainants in the original suit of *Hopkins and others*, filed their bill in the court of chancery, stating the import and object of the original suit, and the injunction thereon; and the subsequent proceedings of *Jones*, and of *Albert and wife*. The object of this bill is, to impeach and set aside the decree obtained by *Albert and wife against Jones*, as fraudulent and void against the complainants, and to stay execution of that decree against any property of *Jones*. The injunction prayed for was granted, and is still in force.

*Jones*, in his answer, denies that the bill filed on the equity side of *Baltimore* county court, was through any combination or confederation with him on the part of *Albert and wife*. And their answer makes the same denial, and sets forth particularly the same facts in defence, which they had before averred in their bill of complaint in *Baltimore* county court.

We shall first in order dispose of the assignment from *Samuel Jones, Jr.*, to *Winn* and *Ross*, as trustees under that conveyance for the creditors of *Jones*.

Having brought our minds to a satisfactory conclusion against the validity of the conveyance from *Samuel Jones, Jr.*, to these complainants, in this cause, we might be content with a reference to the opinion and reasoning of this court, heretofore, in the case of *McCall vs. Hinckley*, 4 *Gill*, 128, as full to the purpose, and claiming our unqualified assent. But as the assent thus given is not only to affect the decision of the case now under consideration, but to determine the law upon that class and character of assignments involved in the present controversy, we are not entirely free to pass a silent judgment upon the question, without a few words in vindication of the opinion and conclusions thus formed.

It is to be regretted that there has been so little uniformity of opinion on a subject of such constant occurrence, and so much

general interest. From their first introduction into commercial practice, these assignments have always encountered difficulties and opposition, and have only finally obtained countenance, in the courts, upon the *assumed* weight of professional opinion in their favor. Still, it may be safely said, that whatever sanction has been given to them, by this alleged preponderating opinion of the profession, the question is still to be considered floating and unsettled; and wherever this influence has been permitted to prevail, it was with a distrust, which, looking to the tone of more recent decisions, is every day increasing. In many of the States, (it may be said in a majority of them,) they have been rejected by the courts, as fit instruments for the perpetration of fraud. In others, where the judges have yielded to the force of professional opinion against their own judgment and conviction, the legislatures, conforming to the general and healthy sentiment of the community, have denounced and exploded them; and wherever sanctioned, as it is not denied they have been, by the highest judicial names of the country, it has been with a constant expression of reluctance and regret that from deference to authority and precedent, they were not at liberty to decide otherwise.

That these considerations, however, do not disembarrass the question, is shewn by the continued conflict of opinion, which has prevailed from the earliest decisions on the subject, up to the recent action of this court in the case of *McCall and Hinckley,* 4 *Gill,* 128, which resulted in a divided opinion of the court. If, then, the alleged preponderance of professional opinion in this State be invoked in their favor, yet it is something that the question is not concluded here, but still open to review, and may now be settled upon principle, by the action of this court, free to dispose of it, upon what may be considered its own intrinsic merits.

It is not pretended that at common law, a debtor in failing circumstances, may not prefer any creditor he may please to select. "Apart from the provisions of the insolvent laws, he may secure one creditor to the exclusion of others," 5 *G. & J.,* 377. Nor is there any objection to the validity of a transfer by the debtor, of his whole estate for the equal benefit of all

his creditors, 6 *G. & J.*, 205. And it is properly assumed, that wherever a party is unable to pay his debts, he becomes morally a trustee for all his creditors. In such a predicament each is entitled, without conditions, to such a ratable share of the property and estate of the debtor as it will yield; and an assignment to that effect is therefore good. On this assumption of equality among the creditors, the bankrupt and insolvent laws of every commercial community proceed, at the proper time, to divest the debtor of his property, and give the distribution into the hands of the law. Where the debtor is involved beyond his means, in equity and justice, his property belongs to his creditors; and such an assignment in favor of all his creditors *equally*, is but acting in conformity with the general policy of the law. Yet this same policy, which encourages an equal distribution among the creditors, has, by legislative enactments, continually warred against these individual preferences at common law; and, under the insolvent system of our own State, has maintained a struggle against them for almost half a century.

But the question is not in relation to this preference of particular and favored creditors, admitted to be good at common law, or upon an assignment, conveying *equally to all creditors without condition*. But whether an assignment of all the property of a debtor, for the benefit of all his creditors equally, *upon condition*, that each shall execute a previous release of his whole debt, or be postponed until all other creditors, signing a release, shall be satisfied in full, is to be treated as valid. In other words, it is said, that a debtor in failing circumstances, unable to pay all his debts, may say to his creditors, that they shall have none of his estate, unless they will release the whole of their claim for a portion; and if they decline to surrender the whole for a part, they shall be deferred to the precarious balance, which the assenting creditors may leave for the satisfaction of the claims of the recusant creditors.

Let us now examine how far judicial and professional opinion, in favor of this doctrine, may be said to preponderate, and what the reasoning that is relied on in support of it. In the case of *Halsey vs. Whitney*, 4 *Mason*, 206, so constantly re-

ferred to, because it is the judgment of that distinguished jurist, *Justice Story*, on the subject, he says: "In one sense the discussion may be said to depend upon local law; in another, so far as it involves principles and presumptions of constructive fraud, it belongs to the common law, and must turn upon the same considerations as would govern in *New York*, *Pennsylvania*, or *England*." And he adds: "General assignments for the benefit of all creditors, free from the operation of the bankrupt laws, are rather encouraged than discountenanced by the common law."

. So far as a general proposition, it is unquestioned, and fully sustained by the authorities both here and in *England*. But do the cases in the *English* courts proceed beyond this general proposition? The case of *Pickstock vs. Lyster*, 3 *Maule & S.*, 371, is an assignment precisely of this character, free from all reservation and condition, and may well be pronounced by the judges, "an act of duty rather than of fraud." So, also, the cases of *Holbird and Anderson*, 5 *Term R.*, 235. *Estwick vs. Calleau*, 5 *Term*, 420. *Meed vs. Howell*, 4 *East.*, 1, are to the same purport; inflict no conditions on the creditor, and reserve no benefit to the debtor.

It is not singular that these cases should have challenged the approbation of the *English* courts, and of *Judge Story*, as being "so far from fraudulent," they were rather the honest acts of the parties. In the case in 5 *Term R.*, 235, *Lord Kenyon* said "there was no fraud. The plaintiff was preferred by his debtor, *not with a view to any benefit to the latter*, but merely to secure the payment of a just debt." Here is, at once, an obvious distinction, and a clear principle, elicited from these cases; and it is at least questionable, whether the case of "*The King*, (in aid of *Braddock*,) *vs. Watson*," 3 *Price*, 6, so much relied on, can be said to controvert it. It has been justly pronounced a bald case, in 11 *Wendall*. The assignment under consideration is no where set out. The terms set forth in the defendants' plea do not purport to exclude any creditor, and would seem to contemplate that each (creditor) should receive only his proportion of the whole fund:—"In trust for the benefit of *all his creditors*, and that they should take the same in

discharge of the respective debts due and owing to them, and release the said *Wheeler* therefrom." It seems to be rather a deed of composition, that contemplated a release from *all* the creditors. There is certainly no *express* preference to any who sign, or an exclusion of such as do not. All are placed upon an equal footing; not under any menace or condition that the portion which one might refuse, shall go to swell the dividend of the others. It gives, by its terms, to none more than his dividend. And this appears, also, to be sustained by the remark of the court: "There is no fraud," they say, "in this case, affecting the assignment, which has been made for equal benefit of all the creditors, *Braddock*, as well as the rest. But even if this were a misconstruction of the case, it is at least justified by the report of it, which, as before observed, is extremely "bald;" and presents but a feeble foundation on which to build a great and overruling principle in the law. It is, at all events, the only case in the *English* books, from which the doctrine can derive any support. And when it is considered, that the other cases referred to expressly discountenance such assignments, as are made with a "view to any benefit to the grantor," it ought not to be allowed that preponderance in the *English* decisions on the subject that is claimed for it here. The authorities there, as seen, do repudiate assignments, even of all the property of the debtor to his creditors, that reserve *any ulterior benefit to himself*. And tried by this test, it is doubtful whether the question in the immediate form now before this court, has ever been distinctly or substantially decided in *England*, in favor of such a stipulation. This, however, is assumed in the case of *Halsey vs. Whitney*.

In approaching the *New York* cases in the progress of *Judge Story's* opinion, it is admitted, that the reasoning of the court in *Hyslop vs. Clarke*, 14 *Johns. R.*, 459, and in *Austin vs. Bell*, 20 *Johns. R.*, 442, is, as far as it goes, strong against these stipulations in favor of the debtor. (4 *Mason*, 228.) Yet in the decision of *Halsey and Whitney*, these authorities are rejected, because "they do not turn upon the naked point of a release, but upon that, as incorporated into a peculiar trust," (p. 230,) and the weight of authority is consequently affirmed

to be in favor of this stipulation.    To this weight of authority, the decision in *Halsey and Whitney* is made to yield, not without the pregnant declaration, however: "If the question were entirely new, the strong inclination of my mind would be against the validity of them."

In the case of *Lippencott vs. Barker*, 2 *Binney*, 174, the point was presented.    And it was there affirmed by two of the judges, that the stipulation for a release was not fraudulent, against the opinion of *Judge Breckenridge*, who pronounced it immoral in the debtor to "couple an interest for himself, in exacting a discharge from that portion of the debt which may remain unpaid."    The *C. J. Tilghman*, (with *J. Yeates*,) rested the decision upon the particular circumstances of the case before them.    The objections urged, that the debtor had no right to insist on so unreasonable a condition, and that it is ill policy to suffer any kind of conveyance that stifles all enquiry, he observed, *had great weight as general principles.* But the question was, how far they were applicable to the present case? to the *circumstances of which,* he begged to be understood, his opinion was confined.

It is conceded, that the validity of these stipulations has been sustained in *Pennsylvania*.    In the case of *Brashears vs. West*, 7 *Peters*, 608, it was *reluctantly* sanctioned as the received doctrine of her courts.    But the *Supreme Court of the United States* through *C. J. Marshal,* expressed themselves far from satisfied, that such a deed, excluding from the benefit of its provisions, all who should within a given time refuse to release, ought to be sustained: "If the release were voluntary," he says, "it would be unexceptionable.    But it is induced by the necessity arising from the certainty of being postponed to all those creditors, who shall accept the terms, by giving the release.    It is not therefore voluntary"---(P. 615.)

This opinion of the *Supreme Court* was expressed long after the decision in *Halsey vs. Whitney;* and indicates distinctly, what the decision of that court would be upon principle, untrammelled by the local decisions of the States.    It is therefore, now, a part of that judicial sanction which may be set up, against the preponderance in favor of the validity of these

stipulations; and whatever the weight of judicial opinion before, it has contributed materially, with the more recent decisions in some of the States, to incline the balance of authority the other way.

To these decisions in *New York* and *Pennsylvania,* and to the *English* authorities, the investigation in this case, of *Halsey vs. Whitney,* has been limited; and even, within those bounds, I am not able to persuade myself, that the sanction they give to that opinion, is so decidedly preponderant, as to control the question, which in *Maryland,* at least, is still open upon principle and authority.

If the *English* cases there cited, do not turn upon this naked point of a release, (and that they do not is manifest from a close review of them,) then it cannot be said, as was urged in argument, from high authority in this State, that the " doctrine is sustained by the uniform current of *English* decisions." And if the doctrine which is affirmed in *Pennsylvania,* is denied in *New York,* then nothing is so far gained in its favor, on the score of preponderance. As regards the latter State, no doubt now remains of the decision of her courts directly upon the point. The case of *Grover vs. Wakeman,* 11 *Wend.*, 187, affirms, that such an assignment to be valid, " must be absolute and unconditional; must contain no reservation or condition for the benefit of the debtor; nor extort from the fears or apprehensions of the creditor, an absolute discharge for a partial dividend." This is characterized by *Chancellor Kent,* as the most " stern decision that exists any where on the subject." And yet, what principle or doctrine of wider latitude can be tolerated, consistent with the sanctity of contracts between debtor and creditor? It is manifest from the reasoning in 4 *Mason* 228, that *Judge Story* himself, freed from authority, would have yielded his entire assent to the doctrine, upon principle. He says: " Where a debtor stipulates for a release, he surrenders nothing but upon his own terms. He attempts to coerce his creditors, by withholding from them all his property, unless they are willing to take what he is willing to give, or is able to give, in discharge of their debts. It is not sufficient to say, that it is a proposition

to creditors; so would be the condition by the debtor to receive a gross sum. Has it not a tendency to obstruct the common right of the creditors? Is not its design, to prevent creditors from receiving compensation, out of the debtor's property, without yielding up some portion of their debts, and conferring on him a substantial benefit which he has no right to demand."

He yielded, however, to what he conceived the preponderance of authority, to the contrary. Not to the decisions of *Massachusetts;* for there the cases were pronounced *in equilibrio.* His decision, therefore, was not upon the local law of that State, but upon what "seemed the weight of authority in favor of them elsewhere." Certainly the point had not been then judicially settled in *Massachusetts.* For in the case of *Borden vs. Sumner,* 4 *Pick.,* 265, under consideration, about the same time, before *C. J. Parker,* the question, (although not embraced in the case,) was declared to be still an open question. His language is: " The point has never been decided in the State of *Massachusetts,* and the court reserve themselves until it is directly presented." Nor does it appear, even now, definitively settled there, at least up to the year 1837, from the case of *Nostrand vs. Atwood,* in the supreme judicial court of that State, 19 *Pick.,* 281, where the question was fully argued; but *Dewey, Justice,* observed: "Upon the point many authorities were cited, which shew that this question has been one elsewhere much litigated, and the result has been a conflict of opinion in the courts of the different States in reference to it. In the view we have taken of the present case, it is wholly unnecessary to consider, particularly, the various adjudications, or pronounce any opinion upon the abstract question, of the effect of the introduction into an assignment of a stipulation for a release by the creditors who become parties to it, in a case where such stipulation might be prejudicial to a creditor indisposed to assent thereto; and who might thus be deprived of receiving his share of the fruits of the assignment."—(P. 284.)

Thus far, then, the preponderance which is claimed in their favor, does not prevail. And in other States of the Union, where the question has been presented, the decisions are still so

much at variance, and in conflict with each other, that the fair limits of a judicial opinion, forbid a more critical examination here. It is not hazarding much, however, to say that the prevailing tone of these decisions, is now more against, than in favor of the validity of these stipulations.

For authorities against these stipulations see in NEW YORK:— 4 *Paige*, 24. 11 *Wendall, Grover vs. Wakeman.* 6 *Hill,* 438, *Goodrich vs. Downs.* 1 *Denio,* 197, *Hastings vs. Belknap.* In OHIO:—5 *Ohio Rep.,* 893, *Atkinson vs. Jordan. Wright R.,* 606, *Wooley vs. Urner. Same,* 701, *Randall vs. Reed.* In NORTH CAROLINA:—1 *Iredel's Law Rep.,* 490, *Heffner vs. Irvin.* In MISSISSIPPI:—1 *Smedes and Marshall,* 208, 265, *Robinson vs. Emory.* In MISSOURI:—6 *Missouri Reports,* 302, *Brown vs. Knox. Same,* 317, 319, *Drake vs. Rogers.* In ALABAMA:—6 *Alab. Rep.,* 179, *Wiswall vs. Ticknor.* 4 *Alab. Rep.,* 322, 374, *Gazzan vs. Pointz.* In CONNECTICUT:—6 *Vol. Conn. Rep.,* 282, *Ingraham vs. Wheeler.* In ILLINOIS:—3 *Scammon,* 417, *Howell vs. Edgar.*

In favor of the validity of such stipulations, see for PENNSYLVANIA:—2 *Binney,* 174. 10 *Sargt. & Rawle,* 439. 5 *Rawle,* 221. 6 *Watts & Sergt.,* 301. 8 *Watts & Sergt.,* 304. 10 *Watts,* 257. For VIRGINIA:—See 8 *Leigh,* 291, *Howell vs. Edgar.* For SOUTH CAROLINA:—1 *Rickad'n Equity,* 217. For MASSACHUSETTS:—4 *Mason,* 206, *Halsey, vs. Whitney.* But see, also, 5 *Pickering,* 28, and 19 *Pickering,* 281, heretofore referred to. For NEW HAMPSHIRE:—5 *N. Hamp.,* 113. But see, also, 10 *N. Hamp.,* 108. For MAINE:—See 5 *Greenleaf,* 245. But, also, 23 *Maine,* 261, and *Ware's Rep.,* 241, 244. See, also, the 1 *Vol. Amer. Leading Cases,* 84, inclined against them.

The cases in the *Supreme Court of the U. S.,* are but in conformity to State decisions, and, therefore, only shew what the doctrine in such States is. And in the States of *Pennsylvania, New Hampshire* and *Maine,* statutes have been passed, declaring such deeds void.

For cases of equivocal import, see further, 2 *Pick.,* 129, 137.

3 *Penrose & Watts*, 83, 94.   3 *Wharton*, 347, 355.   4 *Mason*, 137.   1 *Iredell's Eq.*, 120, 124.   8 *Maine*, 234.   16 *Number Am. Jurist*, 284, *Case of the Brig Watchman.*

An examination, (even cursory,) of these authorities, will shew, that the doctrine, where it prevails, has grown up more by the assent and assumed acquiescence of the profession, than by original authoritative precedent in its favor.   And in the case of the *Brig Watchman*, *Ware*, 232, (16th No. *Am. Jurist*, 285,) *Judge Ware* intimates the salutary caution to the profession and the public, "not to trust too implicitly to a practice, which, to whatever extent it may have insinuated itself into the usages of commerce, was yet to be subjected to the severe and rigorous scrutiny of the law."

To that scrutiny the case at bar is now submitted.   For in this State the subject is *res non adjudicata*.   I am not unmindful, that assignments like the one before us, have had the sanction of high judicial names among us, yielding to the authority of the decisions and the opinions we have had under review. Those decisions and opinions, however, are neither so general or so uniform as to preclude an examination upon the merits, and upon principle, in this State, where the question is still open.   And following the lights of my own mind, I have not found them so overruling, as to bear down the force of those principles and convictions, upon which I feel myself bound to denounce them.

The validity of these assignments must be maintained upon the reasoning, that there is no coercion contemplated upon the creditor.   For if it is intended to compel or coerce the creditor into the terms of the debtor, such an assignment, it seems, may be treated as a fraud.

"The question (says *Judge Story*,) is, whether the intent apparent on the deed, be not to coerce the creditors to a settlement."—*Halsey vs. Whitney*, 4 *Mason*, 229.

"One object of the deed evidently was to coerce the creditors to acquiesce in the terms offered to them."—*Van Ness*, (*Justice*,) 14 *Johns. R.*, 443, *Hyslop vs. Clarke.*

"An attempt to lock up his property from his creditors, so that they cannot reach it, but on such terms as he chooses to pre-

scribe, would be such a manifest effort to defraud them, that two opinions cannot be entertained on the subject."—*Judge Ware*, 8 *Maine*, 234.

In all these cases the stress of language, and the inquiry, is upon the point of coercion. The variation in the terms of the assignment cannot affect the principle, when the intent is manifestly to defeat the creditor in his resort to the property of the debtor, unless he will release the debt. It is not the question here, whether the assignment is void under the statute of *Elizabeth*, 13, *ch*. 5? Conceding it not to be obnoxious to the provisions of the statute, is it not such a disposition of the debtor's property, as is open to the imputation of fraud, upon those to whom it is addressed, and intended to affect? Does it not place the property beyond the reach of the creditor, and deprive him of the most effectual means to enforce his debt? What is it, then, but an address to his fears? Has he any remedy left him, but the fruitless resort against the person of his debtor? The condition of the assignment requires him to abandon his legal remedies, or forfeit his just proportion of the debtor's property; to relinquish the whole of his claim for the portion then available, and all reservation or resort to the future acquisitions of his creditors. "To execute full and absolute releases and acquittances," is the language of this instrument. *All* the property of the debtor is conveyed in general terms, subject to pre-existing liens and priorities to certain preferred creditors. When all is thus withdrawn from the legal action of the creditor upon it, and as his last alternative, he accepts a part, for the whole of his debt, is it the assent of his will, or the assent of his fears that directs him? Can the creditor, in such a position, be considered as acting out his own will, in relation to the debt at risk? He sees at once, his whole relation to the debtor changed by the alternative presented to him; and if he hesitates to accept, the prospect before him is delay, expense, and litigation; and the result in most cases, hopeless and barren. For even the residue of the fund that may remain, after satisfying the assenting creditors, is beyond his reach, except such proportion as the debtor has chosen to reserve to him, from the surplus, if any; and thus the non-assenting creditor is essentially defeated of his remedy, even against such surplus.

But this it is said, is but another mode of preferring creditors, who, by executing the release, become favored over those that refuse; and the debtor it is conceded, may prefer any creditor he pleases. In other words, that the creditors who release, are placed upon the footing of preferred creditors. This by no means follows. It does not necessarily result. that because a debtor may grant a preference *absolutely*, that he may also do so *conditionally*. The distinction is obvious. In the one case he proposes to pay one or more creditors, still leaving his liability and the balance of his property unaffected as regards the others; while in the other case, he designs to influence or coerce all into the terms stipulated, or remove his property out of their reach. He holds out to the creditor this contingent preference, to become absolute only by an act of the creditor, beneficial to the debtor himself, by a release of the debt. Such a power would enable the debtor, at any time, to lock up his property against his creditors, until they accept the terms he chooses to dictate.

It is besides worthy of remark, that this is proposed to be done by an instrument, larger in its scope than the law; that exacts a release more comprehensive, and a disposition of his property less equable, than the law contemplates upon the surrender of a failing debtor, with reference to all which the creditor is supposed to contract. The law exempts the future earnings of the debtor from any further claim on the part of the creditor after a discharge. Yet every acquisition by gift, descent, devise, &c., is still liable, in discharge of his debts. The condition of the release here stipulated for, requires an unqualified surrender of all claim, and is not to be defended upon the ground, that it is a mere legal possibility which the law reserves. For, to this it is a sufficient answer, that such an assignment is, at least, against the policy of our law, which gives the benefit of this possibility to the creditors.

The assignment is conceded to be void, if there be any reservation in it for the benefit of the debtor. In this view of the case, is there not a constructive benefit reserved to the grantor? Besides the benefit of a discharge of the whole debt for a part,

is it nothing to reserve for himself all future acquisitions by gift, descent, devise, &c., of which the possibility is not always remote? A debtor in insolvent circumstances, may still have large expectations from the devise or bequest of friends, and still larger, perhaps, in the course of descent or distribution. If he applies for relief under the insolvent laws, the advantage of all this belongs to his creditors. The testator or donor would, under such circumstances, naturally withhold or withdraw his intended bounty. At all events, the application for the relief by the debtor must defeat these ulterior expectations, and he resorts to a voluntary assignment of this character, by which, (if sustained in law,) he secures the acquisition, otherwise lost to him. And thus both modes of discharge from debts are legalized under one system. Can it be questioned to which the debtor will resort? If no such motive of benefit to himself be in the view of the debtor, thus assigning on condition of release, why not claim the protection of the law, which gives him, (with this reservation,) a full discharge, and secures to his creditors an equal distribution of his property, in obedience to the spirit and policy of the law?

Under the present humane system of policy, in its action upon debtors in failing circumstances, every restraint, calculated to deter him from acting on the fears and apprehensions of his creditors, ought to be sustained. It is sound policy in commercial affairs, and the best security for fair dealing, that the creditor should be assured, that it is not with the debtor an option, at any time, to compel him to accept a portion of his debt, or incur the contingency of losing the whole. To sustain such assignments is to enable the debtor to prescribe his own law, against the known policy of the State; to require of the creditor, acting upon his fears, what the law cannot compel him to do. The debtor dictates the terms of settlement. If the creditor refuses, his safest security for his debt, the property of his debtor, is transferred beyond his reach. Unlike deeds of composition, to which none are compelled, and the assent of all is necessary, and without the assent of all, nothing passes; *here* the terms are absolute and irrevocable upon the execution of the deed, and the creditor must take them as they stand, or

refuse at the risk of losing his debt. It is but seldom, after the execution of such a deed, that *spes recuperandi* ever revives to the unfortunate creditor, who refuses to become a party to its conditions. It is the will of the debtor, which is law to the creditor. And if such disposition of property is valid, what has the creditor left, but to assent upon compulsion. It is mockery to say, under such conditions, that it is optional or voluntary.

Further, to legalize this mode of proceeding, holds out to a debtor an easy and tempting mode to cancel his debts, without further scrutiny or inquiry, such as the law contemplates under a system purposely devised for the discharge of honest debtors. After all the property has passed under a voluntary assignment, the creditor has but small inducement to pursue his claim, with any other prospect than to force his debtor to a legal insolvency, and incur the cost and labor of the proceeding. It ought, therefore, to be considered neither a harsh or severe decision, that repudiates these assignments. Looking to the facilities under our laws of obtaining a discharge, and the justice of those principles, which seek to place all the creditors upon equal terms, it is a just, and not a stern rule, that takes from the debtor in failing circumstances, the right of a voluntary conveyance to his creditors, upon terms dictated by himself. It is a sound standard of right and morality, upon which a court may safely base its decision. It closes the door upon a practice which, if encouraged, becomes the parent of fraud and litigation. Instruments of voluntary settlements like these, may be used for the execution of any nefarious purpose, if left to the discretion of the creditor. They are contrary to the sound principles and policy of the law; and if so, neither general opinion or common consent ought to make them valid. Where they have been sustained, it has been against the sound conviction and judgment of the courts, and with a constant expression of regret, that a doctrine at variance with equity and with morals, must be maintained upon the prevailing understanding of the profession and the public. In deference to this opinion, some among the purest and loftiest legal minds of the country have yielded their own convictions, and given to them the weight of legal authority. They yielded to what at that time was deemed

the preponderance of opinion; but the judgment, and the convictions of these great ornaments and lights of the profession, may still be challenged to our support, in the decision which is here pronounced against the validity of this assignment.

With respect to the creditors of the first class, named and preferred in the assignment, it is unnecessary to inquire, how far their position and rights under the deed may be distinguished from those of other creditors under its provisions. In the opinion of this court, as before expressed, a deed, which does not fairly devote the property of the debtor in desperate circumstances, to the payment of his creditors, but prescribes to them the terms upon which they shall receive part payment, is, in law, fraudulent and void. It is void at common law, *and void as against the statute of* 13 *Eliz., ch.* 5, being made with intent to delay, hinder, and defraud creditors, of their just and legal actions. And when thus void as to part, it is void altogether. The taint, as to part, affects its entirety. The cases of *Grover vs. Wakeman,* 11 *Wendell,* 187, and *Hyslop vs. Clarke,* 14 *Johns.,* 458, before referred to, are cases in point, and parallel with the case before us. They determine, that where a conveyance is good in part, and also bad in part, as against the provisions of a statute, it is void *in toto,* and no interest passes to the grantees under the part which is good. In the former case it is said, that the assignment being void in part, as against creditors and the provisions of the statute, it is void *in toto, although there be no fraud intended.* And to this feature of the case it is, that *Chancellor Kent* directs the remark, that "it appears to be the most stern decision that exists on the subject." 2 *Kent Comm.,* 536, *(note.)* But the decision is far from standing alone and unsupported. *Judge Story* affirms it in *Halsey and Whitney,* 4 *Mason,* 230, and says: "The doctrine in *Hyslop & Clarke,* above, and *Harris vs. Sumner,* 2 *Pick.,* 129, on this point, is sound and wholesome." In 6 *Hill,* 438, *Goodrich vs. Downs:* "If any part of an assignment be contrary to the statute for the protection of creditors against fraudulent transfers, the whole is void." In 9 *Alabama,* 305, *Tickner and Day, vs. Wiswall:* "A conveyance, fraudulent as to part, is void as to the whole of the property conveyed, so far as credi-

tors are concerned." In 6 *Conn.*, 277, *Ingraham vs. Wheeler*, the parallel is true to the case now under review, where the residue, after preferred creditors, was to be paid to creditors, who should release and discharge the debtor, and the court determined the conveyance to be void *in toto*, under the statute of frauds. So also in *Mackie vs. Cairns*, 5 *Cowan*, 547: "A deed or judgment void in part, as being a fraud on creditors, is void *in toto*." And to the same purport are other cases. *Brown vs. Knox*, 6 *Missouri*, 302. (*Mackie and Cairns*,) in *Hopkins' Ch. R.*, 373. *McCLuig and Lecky*, 3 *Penrose and Watts*, 83. *Irvine vs. Keene*, 3 *Wharton R.*, 347. And the case of *Macdonald and Strike*, 2 *H. & G.*, 191, may also be cited to shew, that where a deed is annulled as fraudulent, "it is void *ab initio*, and cannot stand in legal fitness for any purpose." We may also here, in passing, add the remark, that the States of *New Hampshire*, *Massachusetts* and *Pennsylvania*, have enacted especial statutes declaring such assignments void.

It remains now to inquire into the propriety and effect of the decree obtained by *Albert and wife*, on the equity side of *Baltimore* county court, pending the injunction and proceedings in the court of chancery. The answers, both of *Jones* and of *Albert and wife*, upon the proceedings now before the court, deny all fraud and combination between them, to evade the injunction upon the original bill, and to procure a preference by this proceeding in *Baltimore* county court, on the part of *Albert and wife*. They claim to have pursued a legal right which the chancellor's injunction did not restrain; and that they have obtained only what the law awards them, in the race of diligence with other creditors. But they shew that they had knowledge, before filing their bill, that *Jones* had failed in business. In fact, the filing of the original bill was notice to them of the doubtful position of *Jones*, and put them in possession of every fact as alleged in it. The bill was filed in the court of chancery on the 14th of September 1846, stating that the debts of *Jones* were far beyond his means of payment, and that he could entertain no hopes of extricating himself, but by an application for the benefit of the insolvent laws; that he

designed to secure certain of his relations, among others, *Albert and wife,* by giving to them an undue preference over other creditors; and prayed for the appointment of a receiver, and an injunction to restrain *Jones* from giving, and the other parties from receiving, any transfer or assignment in preference to the other creditors. This injunction was granted, and still remains in full force. If *Albert and wife,* therefore, can maintain the priority and lien which they have acquired upon the property of *Jones,* by reason of their decree in *Baltimore* county court, it must be because they have obtained it in fair and due course of law, without any violence to the injunction and original proceedings pending in the court of chancery.

Let it be borne in mind, that the injunction from chancery had interposed all the powers of that court, between the parties, and any avowed or contemplated intention of *Jones* to secure them, or any other of his creditors. The original bill of *Hopkins* and other creditors, had drawn to the chancery court all jurisdiction over the estate of *Jones.* He was averred to be hopelessly insolvent, and the bill looked to the appointment of a receiver, until, under the impending application for the benefit of the insolvent laws, it should pass into the hands of trustees. Until this proceeding before the chancellor was properly disposed of, and while the injunction under it remained in force, the parties were restrained, *in any form,* from seeking the preference which it prohibited. This jurisdiction had attached before the proceedings in *Baltimore* county court *on the same subject matter* were instituted. And the bill filed by *Albert and wife,* in that court, as the basis of their complaint, expressly avers, that *Jones* "promised and pledged himself to secure and protect" their debt. On this point, the averments in both bills are identical; and it is but just to the counsel who advised the proceedings, and filed the bill in *Baltimore* county court, to assume, *from this fact,* all absence of design to counteract the proceeding in the high court of chancery. He doubtless supposed himself fairly in the pursuit of a legal remedy, which the injunction of the chancellor did not design to reach, and that in resorting to an adverse and coercive measure against *Jones,* he was not within the terms of

that injunction, receiving a preference such as was there inhibited.  But it was this very pledge mentioned in the bill before *Baltimore* county court, that had been enjoined, and over which the chancery court had already assumed jurisdiction: and it was an error to assume, that the preference which *Albert* claimed and *Jones* had promised, could be enforced in another *forum*.  The error was in resorting to another, when the jurisdiction had already attached in a *forum* of concurrent power with *Baltimore* county court.  It may also be assumed with regard to the action of *Baltimore* county court, that they did not view the case in the light in which the present bill presents it, otherwise the proceedings before that court would have been arrested before the decree, and the conflict of jurisdiction which resulted, would have been obviated.

The chancellor was therefore right, in regarding the proceedings of the 14th of September 1846, as the commencement of this controversy, and that it drew to the court of chancery the whole litigation in regard to the distribution of *Jones'* estate. More especially, as the injunction there was intended to prevent *Albert and wife* from securing to themselves a preference in any way; and their resort to another tribunal, designed or not, was, under the circumstances, a disregard of the chancellor's injunction.  If even not so in form, and upon its face, yet in substance and effect it amounts to an evasion of that injunction.  Be that as it may, the court of chancery had drawn to itself the whole subject of *Jones'* insolvency, and his intent to prefer certain creditors, more particularly *Albert and his wife*.

In any view of the case, that tribunal was fully competent to grant such relief to them as they were entitled to, and was the appropriate tribunal, to which, under the circumstances, they should have applied.  Their application to another naturally, if not necessarily, involved a conflict of jurisdiction.  The court of chancery had enjoined *Jones* from giving, and any creditor, these parties particularly, from receiving, a preference out of his estate, which was alleged to be insolvent.  It was alleged further, that he could not avoid applying for the benefit of the insolvent laws, and in contemplation of that fact

such preference is void. He did subsequently so apply, and the question (not now necessary for us to determine,) was submitted and fully argued before this court, as well whether this proceeding of *Albert and wife* was not a device to obtain such a preference, as whether it was not also a violation of the injunction, to that effect, in the original bill. Had *Albert and wife* asserted this preference in the court of chancery, on the ground, that *Jones,* when in solvent circumstances, had agreed, and was bound by such agreement, to secure their debt, and particularly by a conveyance of the "*Wheatfield Inn,*" and had they claimed in that court, where the whole matter was submitted, the specific performance of this agreement, we are not now to say, whether such agreement would not have been sustained against the bill of the other creditors. That court, at all events, was, under the existing state of things, the proper tribunal, with full powers to administer ample relief.

*Jones* was already under an injunction not to convey any property, the "*Wheatfield Inn*" particularly, to any creditor. He could not, therefore, convey it, as a preference, without a contempt of the chancellor's injunction. Yet we find *Albert and wife* applying to *Baltimore* county court for an injunction to the same intent against *Jones,* manifestly contemplating to reserve it for execution upon their decree, which was nearly matured in that court. Not until the proceeding was consummated, the decree obtained, and the *fi fa.* levied upon the "*Wheatfield Inn,*" is the existence of the original bill in chancery recalled to mind. Then *Albert and wife,* on the 23rd of February 1847, first filed their answer to this original bill, and there again alleged the indebtedness of *Jones,* his misapplication of the trust in his hands, and his promise to convey to them the "*Wheatfield Inn,*" to replace that fund. The jurisdiction is then recognized over the same subject matter, that forms the basis of proceedings in both courts, the indebtedness and insolvency of *Jones,* and his promise to secure the debt by assignment of the "*Wheatfield Inn.*" And upon this averment and answer, the case in the chancery court now sleeps under the injunction. The property which was enjoined in both courts, was brought within their grasp by the exe-

cution out of *Baltimore* county court, and the answer concludes : "These defendants having no further interest or concern in the premises, as they conceive, pray to be dismissed with their costs," &c.

We are not unmindful, in reviewing the position of the parties in this case, and their proceedings, that the bill on the equity side of *Baltimore* county court, although alleging the promised security of the "*Wheatfield Inn,*" sought to make the claim of complainants there available, by a decree against *Jones,* in money.   But the attempt, afterwards, to restrain the conveyance of the "*Wheatfield Inn,*" under another bill in the same court, when it had already been enjoined in chancery, could have had no other view, than to reserve it for the execution which was afterwards levied upon it.   In the opinion of this court, the whole proceeding was in conflict with the cause which was pending on the same subject in the high court of chancery.   *Baltimore* county court, as a concurrent court of equity, was not, by the complainants there, or by *Jones,* advised of all the facts and proceedings, prior to the filing of their bill, so as to enable that court to act and decide with knowledge; and, therefore, to prevent or counteract this conflict of jurisdiction, it was competent for the court of chancery to restrain the parties from the execution of their decree, and to treat the whole proceeding in *Baltimore* county court as a nullity.

It may be necessary here, in conclusion, to distinguish between this case and *Ellicott vs. U. S. Ins. Co., ante,* 307, which was decided at the last term of this court, and has been invoked here, in support of the proceedings of *Albert and wife.* The injunction, in that case, imposed no restrictions upon the creditors, in the prosecution of their claims.   The decree was limited to the appointment of a receiver, and the preservation of the property of the concern.   It did not, at the time, contemplate or embrace any ulterior disposition of it; and *Ellicott* had neither the right nor the opportunity to prefer his claim in the court of chancery.   To have been stayed in his legal remedy, would have exposed his claim to limitations; and, moreover, his suit was instituted before the appointment of the receiver. Had the court of chancery possessed such a jurisdiction as would

Albert and wife, *vs.* Winn and Ross, *et al.*—1849.

have authorised *Ellicott* to establish his claim there, it is inferrible that they would not have sanctioned his proceeding at law; and the cases would be more analogous. If the decree in the cause, had called upon the creditors to file their claims, it is there said, "the creditor who should institute or continue to prosecute his claim, would be enjoined." But the court of chancery could give *Ellicott* no relief. His remedy was at law alone, and he was not bound to wait until his claim might be subjected to limitations. No fraud or collusion was imputed to him, and he was not to be restrained, "unless there was a proceeding pending, under which, he had a right to go in and prove his claim."

We have shewn that the appropriate remedy for *Albert*, was, to have gone into the court of chancery, upon the bill of *Hopkins*, both to avoid the conflict of jurisdiction, and to assert his right to be secured, in compliance with the subsisting agreement of *Jones*. His proceeding was pending in court, and that court had ample power to afford him the relief, which he sought in another form, in another court of concurrent jurisdiction; and by thus proceeding, subjected his claim to be defeated entirely in that *forum*.

The order of the chancellor, therefore, continuing the injunction, is affirmed.

ORDER AFFIRMED.

NOTE BY REPORTER.—In the case of *Kettlewell vs. Steuart*, decided at June term 1850, and not yet reported, the court, CHAMBERS, MAGRUDER and SPENCE. J., sustained a deed similar in its provisions to the one referred to in this case, MARTIN and FRICK, J., dissented, and DORSEY, C. J., did not sit in the cause, Thus it seems the court are equally divided in reference to the validity of such deeds, CHAMBERS, MAGRUDER and SPENCE, J., being for, and DORSEY, C. J., and MARTIN and FRICK, J., against sustaining them.